**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-14016

Non-Argument Calendar

————————————

SUN TERMINALS, INC.,

AMERICAN LONGSHORE MUTUAL C/O

THE AMERICAN EQUITY UNDERWRITERS, INC,

*Petitioner,*

*versus*

MAXIMO POLO,

DIRECTOR, OFFICE OF

WORKERS' COMPENSATION PROGRAMS,

UNITED STATES DEPARTMENT OF LABOR,

*Respondents.*

————————————

Petition for Review of a Decision of the

Benefits Review Board

Agency No. BRB: 23-0226

————————————

Before BRANCH, LAGOA, and ANDERSON, Circuit Judges.

PER CURIAM:

Petitioner Sun Terminals, Inc., seeks review of a Benefits Review Board decision affirming the award of disability compensation and medical benefits to Respondent Maximo Polo under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), ch. 509, 44 Stat. 1424 (1927) (codified as amended at 33 U.S.C. §§ 901–950). Polo injured his back while working for Sun Terminals as a heavy-machinery operator. Polo filed a claim for benefits under the LHWCA and an Administrative Law Judge ("ALJ") for the U.S. Department of Labor ordered that Sun Terminals pay Polo partial-disability payments and cover Polo's medical expenses related to the workplace injury. The Board affirmed that order, concluding the ALJ's findings were rational, supported by substantial evidence, and in accordance with the law.

In its petition, Sun Terminals argues that the Board erred in determining that the order fell within the ALJ's statutory jurisdiction, and in affirming the ALJ's award of past medical expenses and temporary-partial-disability payments to Polo. After careful review, we conclude that the Board made no such errors and properly affirmed the decision and order of the ALJ. We therefore deny the petition.

## I.        FACTUAL AND PROCUDERAL BACKGROUND

Maximo Polo worked for Sun Terminals as a "Top Pick" operator.[1]  In this role, Polo helped load and unload cargo from shipping vessels and was required to "sit for prolonged periods of time" while operating the Top Pick.  During Polo's shift on March 16, 2019, the hydraulic mechanism in the Top Pick was "not working optimally," so Polo had to "continuously" press the Top Pick's accelerator and manually work its stabilization levers to successfully move cargo.  After doing that for twelve straight hours, Polo felt "extremely tight to the right side of his low back, which progressed to severe pain radiating into the right lower extremity."  Polo completed his shift and reported his injury to his supervisors.  He then went to the emergency room, where he was diagnosed with chronic back pain and prescribed pain medication.

Over the next few weeks, Polo was seen by Dr. Lowell Davis, a pain-management specialist, and Dr. Kenneth Taylor, an orthopedist, both of whom recommended that Polo be treated by a spine specialist for surgical evaluation.  Polo began receiving epidermal injections and physical therapy, but those treatments did not make his pain any better.  On June 19, Sun Terminals transitioned Polo to a light-duty job as a "yard checker," which required less physical exertion, and continued paying Polo the same salary he made in his previous role.

---

[1] A "Top Pick" is large, forklift-like vehicle used for "lifting and moving storage containers."  *See* Richard E. Kaye, *American Law of Products Liability* § 112:101 (3d ed. 2025).

On July 9, Sun Terminals provided Polo with a "choice of physician" form. On the form, Polo identified Dr. Guillermo Pasarin, a neurosurgeon, as his "choice of physician." Polo signed the form, acknowledging he understood that he had "one choice of physician for treatment of [the] job related injury" and that he would not be "permitted to change physicians without authorization." Dr. Pasarin saw Polo on July 31. Dr. Pasarin's notes from this appointment report that an MRI scan of Polo's lumbar spine showed evidence of "multilevel lumbar disc disease." Dr. Pasarin reported that Polo was not yet at "maximal medical improvement" ("MMI") and that Polo was at a "crossroads" as to whether he wished to pursue spine surgery. Dr. Pasarin explained that if Polo did not want surgery, he would refer Polo back to Dr. Davis for continued long-term pain-management care and deem Polo to have reached MMI. According to Polo, the whole appointment took less than ten minutes. Dr. Pasarin did not follow up with Polo after that appointment.

Polo also received an independent medical evaluation from Dr. Luis Pagan, a neurosurgeon. Dr. Pagan opined that Polo's injuries "were consistent with his exacerbation of his preexisting degenerative change" and concluded that Polo did not require surgery. As a result of that examination, Sun Terminals denied Polo "additional medical treatment" related to his back injury.

Having deferred surgery, Polo continued to receive epidural injections from Dr. Davis. Dr. Davis believed that the injections were not working and recommended that Polo receive another

opinion on the viability of surgery. Without surgery, Dr. Davis explained, Polo was at MMI with respect to what could be achieved through pain-management treatment alone. It was then that Polo learned of Dr. Jonathan Hyde, an orthopedic surgeon and spine specialist. Because Sun Terminals would not cover treatment with Dr. Hyde, Polo requested an informal conference with the Office of Workers' Compensation Programs' ("OWCP") district office to receive authorization to be treated by Dr. Hyde. The OWCP set the conference for January 14, 2020, and provided Sun Terminals with notice of the conference.

At the informal conference—which Sun Terminals did not attend—Polo explained that Sun Terminals' insurance carrier "selected" Dr. Pasarin as Polo's physician. Polo expressed that his request for authorization for treatment by Dr. Hyde was based on the "failed spinal injections with Dr. Pasarin" and because he "did not select Dr. Pasarin as a treating physician." Being presented with "no evidence to the contrary," OWCP determined that "the request for choice of physician" to Dr. Hyde was "reasonable." OWCP thus recommended that Sun Terminals authorize Polo's "choice of physician for treatment and surgery" with Dr. Hyde. OWCP also recommended that Polo receive temporary-total-disability payments for the period between Polo's injury on March 16 and return to light-duty work on June 19, and temporary-partial-disability payments for the time since.

Sun Terminals largely rejected OWCP's recommendations. In its view, Sun Terminals did not owe Polo any disability payments

6                    Opinion of the Court                    24-14016

because it paid Polo wages in lieu of compensation for Polo's lost time from work. Sun Terminals also refused to authorize Dr. Hyde as Polo's "first free choice in physicians," arguing that Polo had selected Dr. Pasarin when he signed the choice of physician form. Regardless, Polo began treatment with Dr. Hyde, who diagnosed Polo's injury as "severe multifaceted degenerative change" of the lumbar spine that was "more likely than not" a work-related aggravation of Polo's preexisting chronic degenerative disease. Accordingly, Dr. Hyde recommended that Polo receive a spinal fusion and laminotomy, and that Polo avoid lifting more than twenty-five pounds or working more than forty hours per week.

On February 5, 2020, OWCP referred this matter to the Department of Labor's Office of Administrative Law Judges for a formal hearing. The ALJ was tasked with resolving the nature and extent of Polo's disability; Polo's entitlement to, and the value of, any disability payments; the medical necessity and reasonableness of future medical treatment, including the proposed spinal fusion and laminotomy; the identity of Polo's choice of treating physician; and Sun Terminals' liability for Polo's past and future medical expenses.

At the hearing, Polo testified on the extent of his injury, describing his pain on a typical day as "three to four" out of ten, though he noted that his pain level could rise to "ten" some mornings. When shown surveillance video of him carrying a paint can and ladder, Polo responded, "It's something I had to do. . . . If it's like a very short period of time, I can do that." Polo also testified

that he signed the choice of physician form purporting to select Dr. Pasarin but asserted that the form was simply "given to [him]" by Sun Terminals and that Dr. Pasarin "was not [his] choice." Polo's wife testified that the appointment with Dr. Pasarin "wasn't good" and "was very short." Dr. Hyde then testified about Polo's injury and reiterated his opinions that Polo required surgery and that he was not in any condition to lift over twenty-five pounds or work for more than forty hours per week. Dr. Hyde affirmed that the surveillance footage of Polo did not change his assessment. The ALJ also reviewed Polo's medical records and deposition testimony from Drs. Pasarin, Pagan, Hyde, and Davis.

On January 13, 2023, the ALJ issued its decision and order on Polo's claim for benefits. As to the extent of the injury, the ALJ found that Polo had not yet achieved MMI, crediting Dr. Davis and Dr. Hyde's testimony that Polo's condition could be improved with surgery. The ALJ also relied on their testimony to determine that Polo "is not able to return to his previous work because of his physical limitations after the workplace injury," and thus had established a prima facie case for total disability. However, because Polo was able to procure alternative suitable employment as a yard checker from June 19, 2019, onward, the ALJ concluded that Polo could not receive total disability past that date. Upon calculating the applicable compensation rates, the ALJ awarded Polo $509.95 in total disability per week for the period between March 16, 2019, and June 18, 2019; and $526.13 in partial disability for each week since June 19, 2019.

The ALJ then considered the medical necessity and reasonableness of the recommended spinal fusion and laminectomy, and upon "[c]onsidering and weighing the evidence, affording greater weight to Drs. Hyde and Davis," determined that such treatment was necessary and reasonable. As to the identity of Polo's treating physician, the ALJ explained that while Polo signed the choice of physician form selecting Dr. Pasarin, Polo was given only "a couple of weeks" to decide on surgery after being examined by Dr. Pasarin and felt more "comfortable" with Dr. Hyde. Given the evidence that (1) "the District Director authorized [Polo's] change in his choice of physician in absence of evidence that to do so would be unreasonable; (2) Dr. Pasarin, like Dr. Hyde, gave [Polo] the option to move forward with a spinal fusion surgery; and (3) Polo and his wife "are comfortable [with] and want Dr. Hyde as the treating physician," the ALJ determined that Sun Terminals had not "demonstrated that the change in physician is unreasonable," and concluded that Polo's "request to choose Dr. Hyde as his treating physician [was] reasonable." Finally, the ALJ ordered that Sun Terminals was liable for past and future medical care with Dr. Hyde.

Sun Terminals appealed the ALJ's decision to the Benefits Review Board. According to Sun Terminals, the ALJ erred in failing to afford due weight to Drs. Pagan's and Pasarin's testimony that Polo had reached MMI with respect to his injuries—thus affecting the disability calculations. Sun Terminals also asserted that the ALJ "misunderstood" the issue regarding the identity of Polo's treating physician. In Sun Terminals' view, because "the issue before the [OWCP] district director, and therefore the ALJ, was [Polo's]

request to grant his first choice of physician, rather than a change in physician, to Dr. Hyde," Polo did not properly request—and the district director could not properly grant—a "change in physician" to Dr. Hyde.[2]  Rather, Sun Terminals argued, the ALJ itself ordered that change, despite lacking the jurisdiction to do so.

The Board rejected both arguments.  As to the ALJ's assessment of Polo's disability, the Board explained that its review of the ALJ's factual findings was limited to assessing only whether those findings were supported by substantial evidence and that it could not "reweigh the evidence or substitute its own inferences."  Satisfied that the ALJ's assessment of Polo's disability was rationally supported by Dr. Hyde's testimony, the Board affirmed the disability awards.  The Board then explained that the ALJ "had the authority to resolve factual matters pertaining to the identity and choice of [Polo's] treating physician" and affirmed the ALJ's factual finding that Polo "had changed physicians to Dr. Hyde."  Sun Terminals timely petitioned this Court for review of the Board's order.

## II.    STANDARD OF REVIEW

We review an ALJ's determination of questions of law *de novo*.  *Traywick v. Juhola*, 922 F.2d 786, 787 (11th Cir. 1991).  But we must accept an ALJ's findings of fact as long as they are "supported by substantial evidence in light of the entire record."  *Lollar v. Ala.*

---

[2] Prior to its appeal to the Board, Sun Terminals pressed these issues in a motion for reconsideration before the ALJ.  The ALJ denied that motion, reiterating its finding that the treatment recommended by Dr. Hyde was "reasonable and necessary."

*By-Prods. Corp.*, 893 F.2d 1258, 1261 (11th Cir. 1990); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971) ("Substantial evidence . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."). Because this same "deferential standard of review binds both" this Court and the Benefits Review Board, we review the Board's decision *de novo*. *Lollar*, 893 F.2d at 1261; *see* 33 U.S.C. § 921(b)(3).

### III.    ANALYSIS

Sun Terminals raises three issues in its petition. First, Sun Terminals maintains that the ALJ "granted" Polo a "change in physician" from Dr. Pasarin to Dr. Hyde, despite lacking the authority to do so. Second, Sun Terminals argues that the ALJ erred in awarding Polo payment for past medical with Dr. Hyde. Third, Sun Terminals asserts that the ALJ failed to afford due deference to Dr. Pasarin's opinion on Polo's medical condition in determining whether Polo was entitled to temporary-partial-disability payments. We take each issue in turn.

### A.    The Identity of Polo's Treating Physician

Sun Terminals first argues that the Board erroneously affirmed the ALJ's decision to "grant" Polo a change in physician from Dr. Pasarin to Dr. Hyde, even though the ALJ lacked the authority to do so. This misunderstands the scope of the ALJ's order.

Sure enough, an ALJ does not have the authority to "grant" a change in physicians. Under the LHWCA and its implementing regulations, an employee has the right to "choose an attending physician" in the first instance, 33 U.S.C. § 907(b), but "he may not

thereafter change physicians without the prior written consent of the *employer* (or carrier) or the [OWCP] *district director* . . . upon a showing of good cause," 20 C.F.R. § 702.406(a) (emphases added). But while an ALJ cannot *sua sponte* order that an employee be allowed to change physicians, an ALJ nonetheless retains the authority to resolve—as a matter of fact—who the employee's physician actually is. *See Avondale Shipyards, Inc. v. Vinson*, 623 F.2d 1117, 1119–20 (5th Cir. 1980);[3] *Del Monte Fresh Produce v. Dir., OWCP*, 563 F.3d 1216, 1219 (11th Cir. 2009). That is exactly what the ALJ did here.

After weighing the relevant evidence, the ALJ concluded that the district director "authorized [Polo's] change in his choice of physician" to Dr. Hyde. Our role is limited to determining whether there is "adequate" evidence to support that finding. *Richardson*, 402 U.S. at 401. We are satisfied that there is. The OWCP district director knew that Polo "treated" with Dr. Pasarin and that Dr. Pasarin had been "selected" as Polo's physician. The district director was also aware that Polo wanted a new physician because of the "failed spinal injections" he had already received. And the district director recommended, in writing, that Sun Terminals "authorize" further treatment with Dr. Hyde. Taken together, such evidence reasonably suggests that the district director affirmatively consented to Polo switching from the care of Dr. Pasarin to Dr. Hyde, and that there was "good cause" for that change. *See* 20

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted all Fifth Circuit decisions issued before October 1, 1981, as binding precedent.

C.F.R. § 702.406(a). The ALJ's characterization of the recommendation as authorizing a "change" in physicians is therefore supported by substantial evidence.

Contrary to Sun Terminals' assessment, the ALJ did not take it upon herself to "grant" Polo's request to be treated by Dr. Hyde. Rather, the ALJ made the factual finding that OWCP authorized that change and, resultantly, Dr. Hyde became Polo's physician. Because that determination fell within the ambit of the ALJ's authority to resolve factual disputes, and was supported by substantial record evidence, the Board did not err in affirming the ALJ's conclusion that Dr. Hyde is Polo's attending physician.

## B.    The Award for Past Medical Expenses

Next, Sun Terminals challenges its liability for the treatment Polo has already received. Polo submitted his out-of-pocket medical expenses to his wife's insurance plan, and the ALJ ordered that Sun Terminals reimburse the insurer for all unpaid medical costs related to Polo's workplace injury. The Board did not err in affirming that award.

The LHWCA generally requires that a covered employer pay for all "reasonable and necessary medical services" related to the workplace injury. *Ingalls Shipbuilding, Inc. v. Dir., OWCP*, 991 F.2d 163, 165 (5th Cir. 1993); *see* 33 U.S.C. § 907(a); *see also Atl. & Gulf Stevedores, Inc. v. Neuman*, 440 F.2d 908, 911 (5th Cir. 1971) (explaining employer must cover cost of "necessary treatment for the injury"). The employer also may be required to reimburse the

employee for "any amount expended by [the employee] for medical or other treatment or services," but only if:

> (A) the employer shall have refused or neglected a request to furnish such services and the employee has complied with [33 U.S.C. § 907(b)–(c)] and the applicable regulations; or
>
> (B) the nature of the injury required such treatment and services and the employer or his superintendent or foreman having knowledge of such injury shall have neglected to provide or authorize same.

33 U.S.C § 907(d)(1); *see id.* § 907(b)–(c) (governing procedure for changing physicians); *cf. Kirkland v. Ingalls Shipbuilding, Inc.*, 125 F.3d 852, at *1 (5th Cir. 1997) (per curiam) (affirming denial of reimbursement where employee "neither sought nor received authorization from his employer or the district director" to change physicians). Once the employee is denied the requested care, he is "entitled to reimbursement for all necessary treatment subsequently procured on his own initiative." *Roger's Terminal & Shipping Corp. v. Dir., OCWP*, 784 F.2d 687, 693 n.5 (5th Cir. 1986) (citing *Slattery Assocs., Inc. v. Lloyd*, 725 F.2d 780 (D.C. Cir. 1984); and *Shahady v. Atlas Tile & Marble Co.*, 682 F.2d 968 (D.C. Cir. 1982), *cert. denied*, 459 U.S. 1146 (1983)); *see Neuman*, 440 F.2d at 911. The employee bears the burden of demonstrating that the treatment for which he seeks reimbursement was reasonable and necessary. *Neuman*, 440 F.2d at 911; *Dir., OWCP v. Greenwich Collieries*, 512 U.S. 267, 279–80 (1994).

14                    Opinion of the Court                    24-14016

Here, the record demonstrates that Sun Terminals declined to cover treatment by Dr. Hyde and, for the reasons explained above, that the district director granted Polo's request to change physicians in accordance with the applicable regulations. *See 33 U.S.C. § 907(b)–(c); 20 C.F.R. § 702.406(a).* Substantial evidence also supports the ALJ's conclusion that this treatment was both reasonable and necessary. Prior to treating with Dr. Hyde, Dr. Pasarin indicated that Polo was a potential candidate for surgery and recommended that Polo undergo a "provocative discogram" to determine whether his pain was "disgenic." Dr. Pagan also testified that a lumbar fusion would be "an accepted avenue of treatment." And it is clear that the epidermal-injection treatment Polo had been receiving at that point was not improving his condition. Because the record supports the ALJ's findings that treatment with Dr. Hyde was authorized, reasonable, and necessary, we conclude that the Board did not err in affirming the ALJ's award of past medical expenses.[4]

---

[4] Resisting this conclusion, Sun Terminals maintains that we must reverse the ALJ's award because Polo did not provide notice of his treatment with Dr. Hyde "within ten days following the first treatment," *33* U.S.C. § 907(d)(2), and because the insurer—to whom the reimbursement must be made—was not a party to this case, *see id.* § 907(d)(3); 20 C.F.R. § 702.416. The Board declined to address these issues because Sun Terminals raised them for the first time on appeal. We will do the same. *See Flowers v. Comm'r, Soc. Sec. Admin.,* 97 F.4th 1300, 1305 (11th Cir. 2024) ("Because [the claimant] did not raise this issue before the ALJ . . . , we decline to consider it for the first time on appeal."); *see also Ingalls Shipbuilding, Inc. v. Dir., OWCA,* 976 F.2d 934, 938

### C.    The Award for Temporary Partial Disability

Finally, Sun Terminals asserts that the Board erred in affirming the temporary-partial-disability award because the ALJ did not provide deference to the opinion of Polo's "treating physician," Dr. Pasarin.  We can easily dispose of this argument since we have already accepted the ALJ's determination that Dr. Hyde—not Dr. Pasarin—was Polo's physician.  If anything, then, it is Dr. Hyde's opinion that is due heightened deference.  *See Rivera v. Harris*, 623 F.2d 212, 216 (2d Cir. 1980) ("[O]pinions of treating physicians entitled to considerable weight").

Based on Dr. Hyde's "well-documented, well-reasoned, and well-supported" opinion that Polo had not yet reached MMI, the ALJ awarded Polo partial-disability payments for each week since he began working at a yard checker.  Sun Terminals now asks us to ignore that opinion because it is partially based on Polo's "subjective complaints of pain," which Sun Terminals says are refuted by the surveillance footage showing Polo doing light activities.  We will not be doing that.

"Credibility determinations and the resolution of conflicting evidence are the prerogative of the fact-finder, here the ALJ." *Del Monte*, 563 F.3d at 1219 (alteration adopted) (quoting *Atl. Marine, Inc. v. Bruce*, 661 F.2d 898, 900 (5th Cir. 1981)).  As the ALJ explained, Dr. Hyde was the only surgeon who personally reviewed that

_____

(5th Cir. 1992) ("Because [claimant] failed to present this argument in the administrative proceedings, we may not consider it here.").

footage and testified that it did not change his assessment of Polo's injury. Finding that testimony consistent was Polo's testimony that he could do some lifting, but only for a "short period of time," the ALJ concluded that the surveillance video did not "significantly undermine" Polo's credibility or the subjective inputs to Dr. Hyde's analysis. Since that determination—as well as the determination that Polo was entitled to temporary-partial-disability payments—is supported by substantial evidence, *see Lollar*, 893 F.2d at 1261, the Board was correct to affirm this award as well.

## IV.    CONCLUSION

For the reasons stated, we deny Sun Terminals' petition for review of the Benefits Review Board's order affirming the decision and order of the administrative law judge.

**PETITION DENIED.**